THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RAFAEL RIVERA MÁRQUEZ, Defendant and Appellant.

No. CR-67-258.     Decided December 16, 1968.

*E. Armstrong Watlington, Enrique Miranda Merced,* and *Julio García Antique* for appellant. *Rafael A. Rivera Cruz, Solicitor General,* and *Lydia Nieves Franqui, Assistant Solicitor General,* for The People.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

On the evening of January 27, 1966 a person died as a result of a shot in the head at Ismael Travieso's business located in Canta Gallo Ward of Juncos. According to the autopsy testimony and by reason of the powder marks ap-

pearing in the entrance orifice of the bullet, the shot must have been fired from at least a distance of two feet.

For this death appellant Rafael Rivera Márquez was accused of murder in the first degree; of violation of § 8 of the Weapons Law for bearing and carrying a loaded firearm; and of violation of § 6 of the same act for having in his possession a firearm without a license. The trial having been held before a jury the latter convicted appellant of murder in the second degree and of violation of § 8 of the Weapons Law, bearing and carrying a loaded revolver. The trial court acting without a jury convicted him of violation of § 6 of said Act, possession of firearm without having a license.

The convict appealed from the three convictions. The Humacao Part. of the Superior Court fixed bail bond in all the cases.

By order of this Court of January 31, 1968 the Legal Aid Society was designated to assist appellant. The Society requests the reversal of the judgments rendered.

—I—

The evidence in the record, quite brief, is summarized thus:

The first prosecution witness on the facts was Ismael Travieso, owner of the business. Between eight and eight thirty in the evening of January 27 the defendant, accompanied by two or three other persons, among them the victim, was sitting in his business. They were drinking at a table. They talked and chatted and there was no discussion or fight. The victim ordered a beer and drank it. Another who was with appellant ordered three beers for them. Suddenly one of them got up to put a nickel in the juke box. The victim and appellant remained at the table. When the witness was stooping to take a beer from under the bar, appellant suddenly appeared with a revolver in his hands and fired at that very moment. He saw when appellant fired and when

holding the revolver there, aimed towards the deceased's head. After the shot the victim fell forward and "the defendant came bouncing and said, 'what have I done.'" He identified a revolver as the one he saw in appellant's hands. He said that the victim did not have any weapon when he was shot.

On cross-examination, and considering the sworn statement given before the prosecuting attorney, he testified that a third person by the name of Carlos Enrique and another by the name of Pacheco were there from about seven in the evening. He reaffirmed that when the shot was heard appellant said: "Oh God, what have I done!" He did not threaten the victim at any time, but the witness said that he had said before "tonight I am up to one of my old tricks." Before the witness arrived at the business, at about seven thirty, his wife was in charge. She had told him that the revolver was brought there by Carlos Enrique Santiago in order to sell it. That he offered it for sale.

The second prosecution witness was Mario Pacheco Olmeda. The victim was his childhood friend. At the time of the occurrence they were at Travieso's business. The defendant and the victim remained there. There were no fights, discussions, insults nor anything, nothing except the shot fired by appellant. He did not see when the shot was fired because he had gone out to the street and heard the explosion as he left. He came back and saw the deceased staggering with his hands on his face and falling to the floor. At that time appellant had gone out running. The victim had no weapons and he saw the revolver on the floor left by defendant.

Cross-examined by the defense he said that he had reached the business at the time of the shot; that he did not witness it. He knew Carlos Enrique Santiago by sight and went around with him. He saw the weapon for the first time on the floor, he did not see it in appellant's hands. The defendant went running, "that he said, 'Oh God, what have I done!'"

Upon being examined again by the prosecuting attorney he testified that appellant had said "tonight I am up to one of my old tricks." He said again that he knew Carlos Enrique Santiago and that on that day he had gone out with him, explaining that he referred to appellant.

The prosecuting attorney waived a third witness as cumulative evidence and the latter remained at the disposal of the defense. This witness was the wife of Ismael Travieso, owner of the business. That concluded the evidence for the prosecution.

The first defense witness was the witness waived by the prosecuting attorney, Mrs. Teresa Carrasquillo Pagán, wife of the owner of the business. The night of the death she went early to the business. There she saw appellant and others, among them, Carlos Enrique Santiago who came there for the first time. She does not know at what time he came but he had not been there for long. Upon arriving, Santiago told this man: "I will sell this revolver to you." Santiago arrived at the business with a revolver and offered it for sale to defendant. She identified the weapon which was admitted in evidence as the revolver brought there by Santiago. When he offered it for sale to defendant, she knows that he took it in his hands and looked at it. She knows nothing more.

When cross-examined by the prosecuting attorney she reaffirmed having seen the weapon in the hands of the other man and then in appellant's. When the witness was in charge of the business the victim was not there. She heard the shot from her house. When she left the business she does not know who had the weapon, "when that man said, 'I will sell the revolver to you,' I do not know whether he had it, but he took it in his hands."

Appellant took the witness stand. He testified that he was a barber, married and had two children. As to the facts which occurred his entire testimony was the following: (Record pp. 37–38)

"A.—Well, I was drinking a beer at the bar; then Quique Santiago arrived. Then he told me that he had a revolver for sale. I told him that I do not buy that.

Q.—And what happened? Did he show the revolver to you?

A.—Yes, sir.

Q.—And what happened?

A.—Well, then the deceased arrived, see? and we sat down to drink a couple of beers. Carlos Enrique Santiago asked the deceased whether he wanted to buy the revolver. The deceased said to let him see it. Carlos Enrique, as I saw it, took out the bullets; then I did not see the deceased taking them out or whether or not he took them out, the bullet caught him.

Q.—Did a shot go off?

A.—Yes, sir.

Q.—Did you intend at any time to kill this man Alberto?

A.—No, sir.

Q.—Was he your friend?

A.—Yes, sir.

Q.—For how long did you know Alberto Benítez?

A.—About two years, more or less.

Q.—Tell your exclamation when the shot went off, what did you say?

A.—I said, 'Oh, God, what have I done,' but I was not aware of anything more then because I think that I lost consciousness.

Q.—After that, after that exclamation, you do not know anything more because you think you lost consciousness?

A.—Yes, sir.

Q.—Well, that is all."

Cross-examined by the prosecuting attorney: (Record pp. 39–41)

"You say that the shot went off?

A.—In my opinion, the revolver was unloaded.

Q.—My question is whether the shot went off.

A.—Yes, sir.

Q.—How did the shot go off?

A.—I could not explain.

Q.—You cannot explain. You did not aim at Alberto Benítez's head? Ah?

A.—Well, . . .

Q.—Did you aim at him or not?

A.—Well, I did not, no.

Q.—You did not aim at him in your opinion and in your opinion also you did not pull the trigger, ah?

A.—In my opinion, yes, it was.

Q.—Did you pull the trigger?

A.—Yes, sir.

Q.—Listen, why did you pull the trigger?

A.—I thought it was unloaded.

Q.—You thought it was unloaded but you did not aim at his head?

A.—In conditions to kill him, I did not aim at him.

Q.—You did not aim at him. Tell me, what was your intention in aiming at him, if you did?

A.—With no intention.

Q.—You did not aim? You did not aim at him?

A.—I aimed but not to kill him.

Q.—You aimed at him and pulled the trigger?

A.—But for my purposes, it was unloaded.

Q.—For your purposes it was unloaded. You did not care to look at the revolver to see whether it was unloaded or loaded?

A.—I had never in my life taken a revolver.

Q.—The question is whether you looked to see if it was loaded or unloaded.

A.—No, sir.

Q.—But the truth is that you went out of there running?

A.—Hysterical, yes, sir.

Q.—Hysterical. Does the revolver look like this one?

A.—I did not notice well because I was quite drunk.

Q.—You were quite drunk?

A.—Drunk.

Q.—Tell me, for how long had you been at the business?

A.—Around, about 2 hours.

Q.—You arrived there drunk?

A.—Yes, I did.

Q.—Ah?

A.—I was drunk.

Q.—Tell me whether or not it is true that you also said 'tonight I am up to one of my old tricks'?

A.—No, sir.

Q.—You did not say that?

A.—No, sir.

Q.—That is all with the witness.

THE DEFENSE: Tell me, witness, only one question. You arrived at the business with that revolver?

A.—No, sir.

THE PROSECUTING ATTORNEY: I accept that he did not arrive with it, that the other man was selling it.

Q.—He did not carry it on his person as the complaint says?

A.—No, sir.

THE COURT: You may withdraw, go back to your seat. Does the defense rest the case?

THE DEFENSE: We rest the case, Your Honor."

—II—

In support of the appeal, the Legal Aid Society made the following assignment of errors:

"*FIRST ERROR:* The court erred in its instructions to the jury:

i. In instructing in violation of the ruling of this Court in the case of *People* v. *Natal Rojas,* 93 P.R.R. 823.

ii. In not instructing on the effect of intoxication on the offense of murder.

iii. In not instructing on the possibility of rendering a verdict of involuntary manslaughter.

iv. In not instructing, according to the request made by the defense, on the possibility of incidental carrying.

*SECOND ERROR:* The evidence of the People did not establish the offense of violation of §§ 8 and 6 of the Weapons Law by appellant.

*THIRD ERROR:* The cumulative effect of the errors assigned deprived appellant of the due process of law."

1. The trial court charged the jury: (Record p. 55)

"In this case the defendant has testified, he has taken the witness stand, and therefore, his testimony should be taken into consideration as that of any other witness, *bearing in mind, however, the interest of every accused in his own case.*" (Italics ours.)

■ In *People* v. *Natal Rojas*, 93 P.R.R. 823 (1967), we rejected, with prospective effect, the italicized part of this instruction. Subsequently, upon commenting on that particular, we have expressed our view also on whether or not said instruction, in the light of the facts of those cases, has caused fundamental prejudice. *Cf. People* v. *Dávila Peña,* Judgment of February 29, 1968; *People* v. *Dávila Quiñones,* Judgment of March 29, 1968.

The instruction in this case was given on February 14, 1967, subsequent to our decision in *Natal Rojas,* pronounced on January 16, 1967.

Under the attendant circumstances in which, as to essential aspects, the sole evidence was furnished by appellant himself through his testimony, the instruction could have been prejudicial. In view, however, of our determination of the appeal, we need not enter into further considerations since in a new trial the instruction rejected in *Natal Rojas* shall obviously not be transmitted to the jury.

■ 2. In the light of the facts in the record the failure of the trial court to charge the jury on the effect of intoxication would be harmless. Section 41, Penal Code. Although the commission of an offense of murder in the first degree, which requires the specific intent to kill, deliberately, was charged, the conviction was in the second degree which requires only malice aforethought. The lack of such instruction did not prevent the jury, if it believed it, from taking into consideration, together with all the other facts and circumstances, that appellant was drinking beer.

■ 3. It was a substantial error, in the light of the record, to fail to charge the jury on a verdict of involuntary manslaughter. The court charged:

"Within an information for the offense of murder, the jury may find the defendant guilty of an offense of manslaughter . . . .

"Manslaughter is of two kinds: voluntary, when it occurs upon a sudden quarrel or heat of passion, and involuntary, when

it occurs in the commission of an unlawful act, not amounting to felony,[1] or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

Except for the foregoing statutory definition no more information concerning involuntary manslaughter was given to the jury. Moreover, the trial court expressly prescribed that in the light of the facts presented, the only verdicts which the jury could bring were murder in the first degree, murder in the second degree, and voluntary manslaughter, in case they believed that an offense had been committed. The court did not allow them to consider and return a verdict of involuntary manslaughter.

The Solicitor General consents to the reversal of the conviction of murder in the second degree for the defect indicated in the instructions, and that a new trial be granted. The Solicitor General is right, as well as the defense. The evidence in the record, aside from the credibility which the jury may have given to it, required an instruction on involuntary manslaughter as one of the possible verdicts, if appellant was found guilty—Rule 137 of the Rules of Criminal Procedure of 1963. *People* v. *Burgos*, 76 P.R.R. 187 (1954); *People* v. *Del Valle*, 91 P.R.R. 167 (1964); *People* v. *Tufiño Cruz, ante,* p. 219; *People* v. *Alsina*, 79 P.R.R. 44 (1956); *People* v. *Rosado*, 78 P.R.R. 416 (1955); *People* v. *Rodríguez*, 35 P.R.R. 395 (1926); *People* v. *Fernández*, 49 P.R.R. 571 (1936).

■ 4. As to the defense's request concerning an instruction of incidental carrying, the record reveals the following: (Record pp. 56–57)

[Judge] "Is there any special instruction?

THE DEFENSE: Your Honor, it was delivered to the clerk.

---

[1] Discharging or aiming firearms, without malice, although intentionally, is a *misdemeanor* under § 32 of the Weapons Law of 1951 in force. Aiming, as aggravated assault, is likewise a misdemeanor.

THE PROSECUTING ATTORNEY: I object to that instruction, Your Honor, because here . . . .

THE COURT: I have not read it yet. First, it is handwritten and I do not have to attend to any handwritten instruction. It must be typewritten.[2] The jury please pass to the jury's room. Type it and notify the prosecuting attorney.

(The jury withdraws)

THE COURT: Then, what is the situation? There are some special instructions. Special instructions of the defense. Instructions on what is incidental carrying of weapons. In Humacao, P.R.

What does the prosecuting attorney say? Does he want to say something?

THE PROSECUTING ATTORNEY: I say that that instruction does not lie because there is no basis in the evidence presented to conclude that that instruction should be given.

THE DEFENSE: If the court pleases, may I explain?

THE COURT: Yes, why not.

THE DEFENSE: There is evidence that this gentleman handed this revolver to him right there, that he was not carrying it, that he carried it that very moment and that he handed it to him.

THE COURT: The court believes, according to the evidence, that he handed it to him in the very act, he handed it to him a few minutes before the act and that the act occurred thereafter. That instruction does not lie. It is dismissed. Put it right there for future purposes."

In consenting to the reversal concerning the conviction of murder, the Solicitor General stated that it was not necessary to discuss appellant's other contentions. This error, however, is related to the other conviction by the jury of the offense of bearing and carrying a loaded weapon.

■ In the light of the facts in the record and aside from the credibility which the jury may have given to the evidence,

---

[2] Rule 137 of the Rules of Criminal Procedure of 1963 does not require it, from its face. It provides that either party may present to the court "any *written* request" that certain instructions be given, with copy served on the adverse party.

it was indispensable that the trial court charge it on incidental carrying of a firearm, pursuant to the rules of law established by this Court on incidental carrying. *People* v. *Moll*, 28 P.R.R. 733 (1920); *People* v. *Correa*, 36 P.R.R. 399 (1927); *People* v. *Borges*, 23 P.R.R. 486 (1916); *People* v. *Arana*, 72 P.R.R. 768 (1951); *People* v. *Suazo*, 65 P.R.R. 27 (1945); *cf. People* v. *Cruz Collazo*, 95 P.R.R. 638 (1968).

Such instruction was expressly requested by the defense and denied. The denial was a prejudicial error, particularly before this other instruction of the court to the jury— (Record p. 50)—to the effect that:

". . . the person who *uses* a loaded revolver, although it may have been delivered to him a short instant before the bullet is discharged, that is sufficient to convict a person of the offense of carrying a loaded firearm."

With this instruction, and in the absence of the other the jury had to conclude, because of the mere fact that appellant fired a weapon, according to the credit given to the evidence for the prosecution, that it also made him guilty of bearing and carrying it.

The foregoing instruction, and the refusal to charge on incidental carrying, require likewise the reversal of the judgment of carrying weapons, § 8 of the law, and the granting of a new trial.

In his second assignment of error appellant alleges that the evidence did not establish the offense of violation of §§ 8 and 6 of the Weapons Law. We have already provided with reference to § 8. Insofar as the violation of § 6 is concerned, this section provides that:

"Any person who has or possesses any pistol, revolver, or other firearm *without having a license therefor issued as hereinafter provided,* shall be guilty of a misdemeanor. . . ." (Italics ours.)

The manner of issuing the license is set forth in detail in the following sections of the Law: application under oath

on blanks furnished by the Chief of the Police, investigation, qualifications of applicants, taking of fingerprints, etc.—§§ 16, 17, 18, 19 of the Law.

■ The prosecuting attorney admitted in the course of the prosecution—(Record aforecited)—that appellant did not arrive at the business with the revolver, that the other was selling it. The trial court itself—(Record p. 57)—concluded:

"The court believes, according to the evidence, that he handed it [the revolver] to him in the very act, he handed it to him a few minutes before the act and that the act occurred thereafter."

There is nothing to the contrary in the record to overcome the prosecuting attorney's admission, nor the foregoing finding *of fact* of the court.

Without stopping now to analyze the concept of *having and possessing* of § 6 of the Weapons Law, in the findings of this case § 6 is not applicable. The lawmaker does not contemplate the illogical nor the impossible. The offense punished in § 6 is not to have or possess a firearm, but having or possessing it *without having a license therefor issued in the manner provided in statute.* Under the findings appellant was not bound to register it.

Section 6 of the Weapons Law of 1951 not being applicable to the facts in the record, the conviction by the court of this violation cannot prevail.

In accordance with what has been set forth herein, the judgments of conviction in the cases of murder in the second degree and bearing and carrying a loaded revolver (§ 8) will be reversed and a new trial granted in those cases. The judgment of conviction in the case of violation of §. 6 of the Weapons Law will be reversed and appellant acquitted in this case.

Mr. Justice Blanco Lugo dissented insofar as the violation of § 6 of the Weapons Law is concerned. Mr. Justice Ramírez

Bages dissented in a separate opinion in which Mr. Justice Torres Rigual concurs, with respect to the violation of § 6 of the Weapons Law.

—O—

MR. JUSTICE RAMÍREZ BAGES, with whom MR. JUSTICE TORRES RIGUAL concurs, dissenting.

San Juan, Puerto Rico, December 16, 1968

I dissent from the conclusion contained in the opinion of the Court to the effect that § 6 of the Weapons Law of 1951 is not applicable to the facts in the record of the case for "Under the findings appellant was not bound to register it."

In this case there was actually an accidental having or possession of a firearm without a license. The Weapons Law does not expressly exclude from the requirement of such license the accidental having or possession. On the contrary, it is clearly inferred from its several provisions that the principal purpose of the lawmaker is to proscribe the having or possession of a firearm without license in a drastic manner and this being a legislation of public policy, it should be object of strict interpretation. *Cooke* v. *United States*, 275 F.2d 887 (D.C. Cir. 1959). Thus we see that the dealer in weapons cannot sell a firearm to anybody without *asserting that such person holds a license to have or to possess a firearm*. He may purchase a registered firearm from the person who has it registered *provided such person has a license* to have and possess said firearm. If he fails to comply with these requirements he is guilty of a misdemeanor. (25 L.P.R.A. §§ 432 (d) and 438.) Section 29 (k) (25 L.P.R.A. § 439 (k)) provides that upon the death of a person who holds a license to have and possess a firearm, the executor should report such fact to the Chief of Police. The latter shall make the necessary provisions for the custody of said firearm and if the weapon is

assigned to one of the heirs, *it shall be delivered to said grantee if a license is issued to him.* Moreover, the person who holds a license to have a firearm and wants to get rid of the weapon can only do so in two ways, he may sell it to an authorized dealer or surrender it to the Police.

However, it has been held that an accidental possession without license is excusable when the same is for a lawful purpose, such as having found the firearm and carrying it for the purpose of delivering it to the police or when it results from having disarmed a wrongful possessor. *People* v. *Furey*, 217 N.Y.S.2d 189 (1961). The delay in the police procedure of an application for license is not an excuse for having or possessing a firearm without license. *People* v. *Weisman*, 229 N.Y.S.2d 171 (1962). In the case at bar not only did no circumstance appear to make excusable the having or possession of the firearm, but on the contrary, there is no question that appellant aimed with the revolver at the deceased's head and pulled the trigger for which reason the revolver went off causing the death of the human being at whom he was aiming. For the purposes of the violation, it was immaterial whether he thought that the revolver was unloaded, since the criminal intent is not an essential ingredient of the offense in question it being only necessary to have the intent of committing the prohibited act, that is having the firearm without license.

In my opinion the Court should have affirmed appellant's conviction for violation of § 6 of the Weapons Law.